**SECOND DIVISION**
**ANDREWS, P. J.,**
**MILLER and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**June 26, 2015**

# In the Court of Appeals of Georgia

A15A0136. OLDS v. THE STATE.

MILLER, Judge.

Following a jury trial, Vashon Olds was convicted of false imprisonment (OCGA § 16-5-41 (a)) and battery (OCGA § 16-5-23.1 (a)).[1] Olds appeals from the judgment on his convictions, contending that the trial court abused its discretion in admitting evidence of similar acts over Olds's objections. For the reasons, that follow, we affirm.

Viewed in the light most favorable to Olds's convictions,[2] the evidence shows that Olds was a close family friend of the victim, and they were briefly involved in

---

[1] The jury acquitted Olds on additional charges of kidnaping and aggravated assault with intent to rape.

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

a romantic relationship. In February 2009, the victim moved to Albany to attend college, and she contacted Olds about possibly living in his trailer. The victim and Olds agreed that the victim and her son would move in with Olds, and the victim would pay for half of the utilities. The victim and her son each had their own room and they had their own bathroom that they shared. The victim told Olds that they would not be resuming their prior romantic relationship, and Olds confirmed that he understood.

Shortly after the victim moved in, she and her boyfriend were sitting in a car outside of her grandmother's house when Olds pulled up behind their vehicle, got out of his car, and told the victim's boyfriend that she was "his lady." Olds subsequently apologized for his behavior, and the victim returned to his trailer.

The next day, the victim told Olds that she was going out of town. She got into her car, intending to leave, but then realized that she had forgotten her son's jacket in the trailer. The victim went inside the trailer and, as she walked into her bedroom, Olds followed her. When the victim asked Olds what he was doing, he responded that he was getting ready to take out the trash. The victim then walked down the hallway, and Olds jumped her from behind, while holding a white tie in his hand. The victim put her arms up to keep the tie away from her neck and avoid being choked.

2

The victim begged Olds to let her go, but he told her "you're not going anywhere," and he pushed her onto a chair in his bedroom. Olds then tied up the victim, picked her up and threw her on the bed. When the victim again begged him to stop, Olds got on top of her and told her that if she cooperated and shut up, "it'll be over with." Olds began to unbutton and unzip the victim's pants. The victim screamed and Olds put his hands over the victim's nose and mouth so that she could not breathe.

Olds then duct taped the victim's mouth. When she removed the tape, he told her that if she screamed, he was going to kill her. Olds also told the victim that he was going to kill himself because he was "not going back to prison." When the victim continued to plead with Olds, he turned her over and sat her up on the edge of the bed. The victim continued to talk to Olds to calm him down, because she was afraid that he would kill her.

After about 30 minutes, Olds untied one of the victim's ties, and picked up a long blade from a tray beside his bed. The victim was afraid Olds was going to cut her so she told him to stop and asked him for some water. At that point, the victim received a phone call from her grandmother; Olds had a brief conversation with the

3

victim's grandmother; and after the phone call, the victim begged Olds to let her go. Olds picked up the blade and began to cut the ties off the victim's arms and stomach.

Once free, the victim continued to talk to Olds, telling him that she forgave him, and they could "work it out." Eventually, the victim asked Olds to walk her to the car, which he did, after she told him that she would return. The victim drove down the street, flagged down a police officer about a minute later and told the officer what had happened.

At trial, the State presented evidence of extrinsic acts involving Olds's ex-girlfriend, T. H. T. H. testified that, in June 1999, Olds called her, told her she had forgotten something at his house and said he would come over to return the item. When Olds arrived, T. H. was in the kitchen cooking. Olds came up behind T. H. with a knife, told T. H. that he was not leaving, said if he could not have her, then nobody else would, and then cut T. H.'s chin. T. H. yelled for her kids to run out of the house and struggled with Olds before running to a neighbor's house.

The State also presented evidence of extrinsic acts involving K. B., who testified that, in August 2012, Olds drove her to Walmart to buy a part for her mother's car, which he was repairing. After buying the part, Olds and K. B. headed back to her house when Olds suddenly took a detour, saying that he needed to go to

4

home to grab a missing part. When they arrived at Olds's home, he told K. B. that she could not stay in his car, so she followed him up to his room. After looking around, Olds told K. B. that he could not find the missing part, so K. B. turned towards the door to leave. Olds grabbed K. B. from behind and threw her onto the bed. Olds then forcibly held K. B. down, pulled down her shorts and underwear and placed his tongue on her vagina.

K. B. told Olds to stop and tried to push him away, but he refused to stop and he then tried to insert his penis into her vagina. When K. B. grabbed Olds's penis and scratched his leg and back, Olds got off of her. After Olds drove K. B. home, she told her mother what had happened, and her mother immediately called the police.

In his sole enumeration of error, Olds contends that the trial court erred in admitting evidence of extrinsic acts over his objection. We disagree.

Because this case was tried after January 1, 2013, Georgia's new Evidence Code applies. See Ga. L. 2011, Act. 52, § 101; *Bradshaw v. State*, 296 Ga. 650, 655 (3) (769 SE2d 892) (2015). OCGA § 24-4-404 (b) of the new Evidence Code provides:

> Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity

5

therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Accordingly, in determining the admissibility of evidence of extrinsic crimes and acts under OCGA § 24-4-404 (b), we apply a three-part test adopted from the Eleventh Circuit, which provides:

(1) the evidence must be relevant to an issue other than defendant's character; (2) the probative value must not be substantially outweighed by its undue prejudice; (3) the government must offer sufficient proof so that the jury could find that defendant committed the act.[3]

(Citation omitted.) *Bradshaw*, supra, at 296 Ga. at 656 (3).

Under OCGA § 24-4-403, which mirrors Federal Rule of Evidence 403,

[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

---

[3] With regard to the third prong of this test, "[extrinsic] acts evidence may be admitted if the [trial] court concludes that the evidence is sufficient for the jury to find by a preponderance of the evidence that the other act was committed." (Citation omitted.) *Bradshaw*, supra, 296 Ga. at 656 (3), n.4.

6

See id. at 655 (3). We review the trial court's decision to admit evidence under OCGA § 24-4-404 (b) for a clear abuse of discretion. Id. at 656 (3).

To satisfy the first prong of the test for admission of extrinsic acts, the State had to show that the evidence of the extrinsic acts was relevant to an issue other than Olds's character. At trial, the trial court admitted evidence of Olds's extrinsic acts to show his intent, identity, motive and opportunity and to disprove mistake or accident. With regard to intent, Olds argues that his intent was not at issue because the issue was whether the crimes in this case actually happened.[4] Contrary to Olds's contention,

> [a] defendant who enters a not-guilty plea makes intent a material issue which imposes a substantial burden on the government to prove intent, which it may prove by qualifying [extrinsic] evidence absent affirmative steps by the defendant to remove intent as an issue. Where the extrinsic offense is offered to prove intent, its relevance is determined by comparing the defendant's state of mind in perpetrating both the extrinsic and charged offenses. Thus, where the state of mind required for the charged and extrinsic offenses is the same, the first prong of the [extrinsic evidence] test is satisfied.

---

[4] At trial, Olds argued that the victim lied about the crimes after he told her that she needed to find somewhere else to live.

7

(Citations and punctuation omitted.) *United States v. Edouard*, 485 F3d 1324, 1345 (II) (C) (1) (11th Cir. 2007).

In this case, the charged offenses included aggravated assault. By pleading not guilty, Olds made his intent a material issue, and he took no affirmative steps before trial to indicate that the State was relieved from proving intent. See *Edouard*, 485 F3d at 1345 (II) (C) (1). With regard to Olds's state of mind, the charged offense of aggravated assault and both of the extrinsic acts are very similar since all three offenses involve violent assaults on female acquaintances whom Olds attacked from behind. Clearly, all three offenses involved the same state of mind – Olds's intent to harm women he knew by attacking them from behind. Therefore, the evidence of Olds's extrinsic acts was plainly relevant to the issue of intent, and the first prong was satisfied.[5] See *United State v. Zapata*, 139 F3d 1355, 1358 (11th Cir. 1998).

With regard to the second prong, we are satisfied that the trial court did not clearly abuse its discretion in determining that the probative value of evidence of the extrinsic acts was not substantially outweighed by its prejudicial effect. Similarity between the charged offense and the extrinsic acts is one factor that may be

---

[5] Since we determine that evidence of the extrinsic acts was admissible to prove Olds's intent, we need not address his additional arguments that evidence of those acts was not relevant to show plan or motive.

considered in determining probative value. See *Edouard*, supra, 139 F3d at 1345 (II) (C) (1); *Bradshaw*, supra, 296 Ga. at 657 (3). As set forth above, the charged offense of aggravated assault and the two extrinsic acts were very similar since all three acts involved Olds's violent attacks on women her knew from behind. Moreover, any unfair prejudice caused by admitting evidence of the extrinsic acts was mitigated by the trial court's detailed limiting instructions to the jury. See *Edouard*, supra, 139 F3d at 1346 (II) (C) (1); *Zapata*, supra, 139 F3d at 1358.

Finally, we conclude that the third prong is satisfied. T. H. testified that Olds attacked her from behind in 1999, K. B. testified that Olds attacked her from behind in 2012, and Olds presented no evidence to rebut their testimony. Given T. H. and K. B.'s detailed and unrebutted testimony about those attacks, a jury could have found by a preponderance of the evidence that Olds's committed the extrinsic acts. See *Edouard*, supra, 139 F3d at 1345 (II) (C) (1). Accordingly, we conclude that the trial court did not clearly abuse its discretion by admitting evidence of the extrinsic acts, and we affirm Olds's convictions.

*Judgment affirmed. Andrews, P. J., and Branch, J., concur*.